## S16A0710. MULLINS v. THE STATE.
(791 SE2d 828)

BENHAM, Justice.

Appellant Marcus Rashad Mullins is appealing his convictions for felony murder and related crimes stemming from the death of Damien Daniels.[1] Viewed in a light most favorable to upholding the

---

[1] The crimes occurred on March 8, 2009. On September 17, 2009, a DeKalb County grand jury indicted appellant on charges of malice murder, felony murder (aggravated assault), aggravated assault, and possession of a firearm during the commission of a felony. From October 18, 2010, to October 26, 2010, the State tried appellant before a jury, and the jury returned a verdict of guilty on all charges except malice murder. On November 12, 2010, the trial court sentenced appellant to serve life in prison for felony murder and to serve five

verdict, the trial transcript shows that on the night in question, appellant and his friends Thomas Harris, Kenneth Dwight, and Karalo Brownlee attended a house party in DeKalb County. Some partygoers spilled out from the house into the street. Daniels and his friends were socializing and drinking at a house two doors down from the party. Daniels's friends testified that he was intoxicated and was dancing on cars with his shirt off during the party. At some point, gunshots rang out, and some partygoers decided to leave.[2] Appellant and Harris likewise went back to their vehicle and began to leave the area. While attempting to move his car in order to make a U-turn, appellant almost hit Daniels leading the two young men to exchange angry words, and, according to Harris's testimony as well as the testimony of another witness, appellant brandished a gun at Daniels. This first encounter between appellant and Daniels ended with Daniels walking away with his friends and with appellant reentering his vehicle.

Several minutes later, a second encounter occurred between appellant and Daniels. Harris testified that as appellant was completing the U-turn to leave the neighborhood, appellant told Harris, "I'm going to get him," referring to Daniels. Harris testified appellant drove near Daniels, stopped the vehicle, placed one foot outside of his vehicle and began shooting. Harris also said that as appellant was stepping out of the car with one foot, appellant told Daniels to "come here." Several eyewitnesses testified Daniels was shirtless and unarmed when appellant shot him. Appellant shot Daniels five times[3] and Daniels died from gunshot wounds to his torso.

At trial, appellant's audio-recorded interview with police was played for the jury. During the interview, appellant initially told police he was leaving the party as the shooting began, that he did not have an altercation with anyone, that he did not have a gun and that

---

consecutive years in prison for possession of a firearm. The aggravated assault count merged for sentencing purposes. Appellant moved for a new trial on December 8, 2010, and amended the motion on February 17, 2015, and again on March 2, 2015. The trial court held a hearing on the motion on February 27, 2015, and denied the motion on August 19, 2015. Appellant filed a notice of appeal on September 14, 2015, and, upon receipt of the record, the appeal was docketed to the April 2016 term of this Court and was orally argued on April 26, 2016.

[2] No evidence was presented as to who was doing the shooting or why, but several witnesses presumed that these gunshots were celebratory in nature. During the investigation of Daniels's death, police did recover a number of .38 shell casings, but these shell casings ultimately had no relation to the crime other than to corroborate that gunshots were fired prior to the deadly shooting.

[3] Appellant admitted he recovered five shell casings from his car and that he threw the shell casings away.

he did not shoot Daniels. Later on in the interview, appellant admitted that he had a 9mm Hi-Point handgun[4] inside his car and that he used it to shoot Daniels when Daniels "slammed" open his car door. In his recorded statement to police, appellant admitted that he did not see Daniels with a gun, but said that he shot Daniels based on a statement Daniels allegedly made during the first encounter that Daniels was going to get his "tool," which is a euphemism for a gun. Appellant also testified at trial, restating that he shot Daniels based on the fact that Daniels had earlier mentioned getting a "tool," because Daniels "snatched" appellant's car door open, and because Daniels moved his hand quickly. The medical examiner recovered a 9mm bullet from Daniels's body, and the ballistics expert testified the bullet was fired from appellant's 9mm Hi-Point handgun.

1. The evidence described above was sufficient to authorize a rational jury to find appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant contends the trial court erred when it denied his request to admit evidence of the victim's specific acts of violence against a third person, otherwise known as *Chandler*[5] evidence. Specifically, appellant sought to admit an indictment and a written statement to police showing that Daniels had participated in a drive-by shooting of a third person by driving the vehicle. In order to establish a prima facie case of justification in support of his *Chandler* motion, appellant relied on, and the trial court considered, testimony presented during appellant's immunity hearing.[6] Five witnesses testified at the immunity hearing, and their testimony is summarized below.[7]

Kelvin Parks, who was proffered by the defense, was a party attendee who did not know appellant or Daniels at the time of the incident.[8] During the second encounter between appellant and Daniels, Parks says he saw Daniels open appellant's car door and then heard and saw gunfire coming from appellant's car, but did not see the

---

[4] After his police interview, appellant went with authorities to retrieve the gun from the place he hid it on the night of the shooting.

[5] *Chandler v. State*, 261 Ga. 402 (3) (b) (405 SE2d 669) (1991). Because this case was tried prior to the effective date of Georgia's new Evidence Code, *Chandler* is applicable in this case; however, for all cases tried after the effective date of the new Evidence Code, *Chandler* has been superseded. *See Hendrix v. State*, 298 Ga. 60, 62 (2) (a) n. 2 (779 SE2d 322) (2015).

[6] See OCGA § 16-3-24.2.

[7] The trial court also reviewed a bond hearing transcript when considering the *Chandler* evidence. We make reference to it where relevant.

[8] Parks testified that he had several conversations with appellant and appellant's trial counsel after the incident. Parks never made a statement to police.

gun. Parks said that as Daniels approached appellant's car, Daniels was holding a hat over one of his hands, but Parks admitted he never saw Daniels with a gun and said he realized Daniels did not have a weapon when he saw him open appellant's car door. Parks said appellant was in the car during the shooting and did not exit the vehicle. Parks did not hear any words exchanged between appellant and Daniels.

Kenneth Dwight, who was proffered by the defense, was appellant's friend and rode to the party with another mutual friend, Karalo Brownlee. Dwight says the vehicle he was in with Brownlee was initially parked behind appellant's car and that he stayed in the car with Brownlee the entire time he was at the party. By the time of appellant's second encounter with Daniels, Brownlee's car was in front of appellant's vehicle as both drivers had maneuvered their vehicles so that they were in a position to exit from the neighborhood in the same direction they had driven to enter. Looking through the back window of Brownlee's car, Dwight says he saw Daniels open appellant's car door and that Daniels "jumped back" when he opened the door. Dwight heard gunfire, but did not see the shooting; and he says he never saw appellant or Daniels with a gun.[9] Dwight did not hear anything appellant and Daniels said during this second encounter.

Karalo Brownlee, who was proffered by the defense, said he saw Daniels open appellant's car door.[10] He stated that appellant never exited his car and said he had no idea who was shooting during the second encounter because he was busy driving away.

Joshua Holder, who was proffered by the State as a rebuttal witness, was at the party with Daniels.[11] Holder testified that immediately prior to the second encounter, Daniels was in Holder's car in the passenger seat and, because Daniels had dropped his hat out of the window, Daniels exited the car to retrieve it. While retrieving the hat, Holder says appellant drove up to Daniels and said something to Daniels. Holder says Daniels then ran up to appellant's car in a fighting stance with his fists balled up. Holder stated that Daniels did not open appellant's car door and said that appellant "hopped" out of the car and started shooting as soon as Daniels ran up in a fighting

---

[9] Dwight also testified at appellant's bond hearing. At that hearing, Dwight stated that he did not know Daniels was shot because he and Brownlee "were already gone."

[10] At the bond hearing, Brownlee testified as follows on direct examination: "[Daniels] looked like he was coming up to [appellant's] door and then that [was] when I pulled off." Brownlee ultimately did not testify at appellant's trial.

[11] By the time appellant was tried, Holder had died in a workplace accident; however, his immunity hearing testimony was read into the record at appellant's trial.

stance. Holder also stated that appellant had one foot out of the car when he fired his gun. Holder confirmed Daniels was intoxicated, shirtless and unarmed at the time of the shooting.

Harris, who was proffered by the State as a rebuttal witness, testified he was in the passenger's seat of appellant's car when the shooting occurred. He stated that as appellant was making his U-turn to leave the party, appellant said, "I'm about to get him."[12] Harris knew appellant had a gun because appellant had brandished it during the first encounter with Daniels.[13] Harris said appellant stopped the car, placed one foot out of the car and began shooting. Harris could not see Daniels as the shooting took place and said he did not know who opened appellant's car door. On cross-examination, Harris admitted he told police appellant called Daniels over to the car prior to shooting him, although during direct examination he stated he could not hear anything appellant and Daniels said to each other during the second encounter.

In order for *Chandler* evidence to be admitted at trial, a defendant must make a prima facie showing of justification by producing sufficient evidence that the victim was the aggressor, that the victim assaulted the defendant, and that the defendant was honestly trying to defend himself. *Cloud v. State*, 290 Ga. 193 (2) (719 SE2d 477) (2011); *Milner v. State*, 281 Ga. 612 (2) (641 SE2d 517) (2007). See also *Slaughter v. State*, 292 Ga. 573 (2) (740 SE2d 119) (2013). Prior to ruling, the trial court noted it had given substantial weight to Harris's immunity hearing testimony. Appellant contends that the trial court never should have made any credibility determinations in regard to whether he had established a prima facie case, but rather, should have determined whether the evidence was sufficient for a jury to find that Daniels was the aggressor. Although the trial court erred to the extent it made credibility determinations, the trial court's ultimate decision was not in error because appellant failed to produce sufficient evidence to establish a prima facie case of justification.

Here, none of the defense witnesses stated that Daniels assaulted or attacked appellant at the time of the shooting, but only that he opened appellant's car door, an act which, in and of itself, is not necessarily aggressive. Moreover, Dwight testified Daniels jumped back once he opened appellant's car door, indicating Daniels was not attacking or assaulting appellant at the time he was shot. See, e.g.,

---

[12] At trial, Harris testified appellant said, "I'm going to get him."

[13] Holder also said that appellant brandished a gun during the first encounter which ended with appellant and Daniels going their separate ways.

*Walden v. State*, 267 Ga. 162 (2) (A) (476 SE2d 259) (1996) (even if the victim shows some aggressive behavior, the defendant must still show he was assaulted and honestly defending himself when he fired the fatal shot). In addition, none of the defense witnesses said they heard what was said between appellant and Daniels during the second encounter. Furthermore, in his statement to police, appellant stated that he shot Daniels, not because Daniels "slammed" open his car door, not because Daniels came at him with raised fists, not because Daniels was armed, not because Daniels assaulted him, but because, during the first encounter, Daniels had allegedly made a statement that he was going to get his "tool." Appellant's own rationale for his shooting Daniels did not establish a prima facie case of justification. See, e.g., *Collier v. State*, 288 Ga. 756, 757 (2) (707 SE2d 102) (2011) ("Verbal threats and fisticuffs do not justify the use of deadly force."); *Felder v. State*, 273 Ga. 844 (4) (545 SE2d 918) (2001) (where the victim verbally threatened the defendant and took a swing, defendant could not establish a prima facie case of justification because when the defendant stabbed the unarmed victim, he was not honestly defending himself). Thus, had the evidence been limited to appellant's witnesses and his statement to police, he would not have met his burden of showing justification.

As to the witnesses presented by the State, Harris testified that, moments before the shooting, he heard appellant say, "I'm going to get him," or words to that effect. Harris's testimony about what appellant said inside the vehicle was undisputed.[14] Holder testified that appellant said something to Daniels while Daniels was in the street retrieving his hat, appellant drove near Daniels, and then Daniels ran up with his fists closed in a fighting stance.[15] Both Harris and Holder testified appellant stepped out with one foot and shot Daniels; whereas the defense witnesses claimed appellant never stepped out of the vehicle. Regardless of whether Daniels opened appellant's car door and whether appellant shot from inside his vehicle or with one foot outside his vehicle, the undisputed evidence presented shows appellant intended to initiate the second encounter with Daniels when he told Harris, "I'm about to get him." Although Holder said Daniels struck a pose as if he wanted to engage in fisticuffs, no one

---

[14] Although appellant did not testify at the immunity hearing or during the *Chandler* hearing, his statement to police was in evidence; but his in-custody statement made no mention as to what he and Harris discussed in the car.

[15] During oral argument, appellate counsel argued that appellant's statements to Daniels to "come here" occurred when Daniels was already at the car door with a raised fist. This argument is not supported by the evidence that was proffered at the bond hearing or the immunity hearing.

disputes Daniels was intoxicated, shirtless and unarmed at the time of the shooting. The evidence on its face did not show that Daniels was the aggressor during the second encounter. See, e.g., *Graham v. State*, 274 Ga. 696 (3) (558 SE2d 395) (2002) (the defendant's belief the victim was armed insufficient to show the victim was the aggressor for the purpose of introducing the victim's prior violent acts against third persons); *Milner*, supra, 281 Ga. at 613 (evidence insufficient to show that the victim was the aggressor where first altercation had ended and, during second altercation, defendant held a gun on the unarmed victim and shot the victim when he stepped toward the defendant); *Harrison v. State*, 268 Ga. 574 (3) (492 SE2d 218) (1997) (the defendant who was hit by the victim a few minutes before she shot the victim, was unable to show the victim was the aggressor for the purpose of introducing evidence of the victim's violent acts against others).

Accordingly, pursuant to the right for any reason rule (see *MCG Health, Inc. v. Owners Ins. Co.*, 288 Ga. 782 (2) (b) (707 SE2d 349) (2011)), the trial court properly excluded the purported *Chandler* evidence.[16]

3. Appellant alleges counsel rendered constitutionally ineffective assistance by failing to object to certain jury charges concerning justification, self-defense, defense of habitation (motor vehicle), and the duty to retreat. The trial transcript shows and the trial counsel admitted at the motion for new trial hearing that the defense requested all of the charges now at issue on appeal. Our review of the charges in their entirety[17] indicates counsel's performance was neither deficient in requesting the charges nor deficient for failing to request that

---

[16] At the *Chandler* hearing, appellant proffered an indictment and a written statement to police indicating that Daniels was the driver during a drive-by shooting in which the intended victim was not actually injured. Yet, defense counsel noted the victim of the drive-by would be unable to testify because he was deceased due to reasons unrelated to the events alleged in the indictment.

[17] Prior to deliberations, the trial court charged the jury as follows:

An affirmative defense is a defense that admits the — that admits the doing of the act charged, but seeks to justify, excuse, or mitigate it. Once an affirmative defense is raised the burden is on the state to disprove it beyond a reasonable doubt.

The fact that a person's conduct is justified is a defense to prosecution for any crime based on that conduct. The defense of justification can be claimed when the person's conduct is justified under [OCGA §§] 16-3-21 and 16-3-23.

[OCGA §] 16-3-21 says that a person is justified in threatening or using force against another person when, and to the extent that, he reasonably believes that such threat or force is necessary to defend himself against the other's imminent use of unlawful force.

A person is justified in using force that is intended or likely to cause death or great bodily injury — great bodily harm only if that person reasonably believes that

any charges be withdrawn. The decision as to what jury charges to

such force is necessary to prevent death or great bodily injury to himself or to prevent the commission of a forcible felony.

The state has the burden of proving beyond a reasonable doubt that the defendant was not justified. A person is not justified in using force if that person initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant, is attempting to commit, is committing, or is fleeing after the commission or attempted commission of a felony, or was the aggressor or engaged in combat by agreement, unless the person withdraws from the encounter and effectively communicates his intent to withdraw to the other person, and the other person still continues or threatens to use the use of unlawful force.

A forcible felony is any felony that involves the use or threat of physical force or violence against any person. Aggravated assault is a felony as previously defined by the court.

[OCGA §] 16-3-23 says a person is justified in threatening or using force against another person when, and to the extent that, the person reasonably believes that such threat or force is necessary to prevent or terminate the other's unlawful entry into or attack upon a motor vehicle.

A person is justified in using force that is intended or likely to cause death or great bodily harm only if entry is made or attempted in a violent and disorderly manner and the person reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person living or present in the motor vehicle and that such force is necessary to prevent the assault or offer of personal violence; or the person reasonably believes that the entry is made or attempted for the purpose of committing a felony in the motor vehicle and that such force is necessary to prevent the commission of the felony.

One who is not the aggressor is not required to retreat before justifying — before being justified in using such force as is necessary for personal defense or in using force that is likely to cause death or great bodily harm if one reasonably believes that such force is necessary to prevent death or great bodily harm to oneself or to prevent the commission of a forcible felony.

In applying the law of self-defense, a defendant is justified to kill another person in defense of self. The standard is whether the circumstances were such that would excite not merely the fears of the defendant, but the fears of a reasonable person. For the killing to be justified under the law, the accused must truly have acted under the influence of these fears and not in the spirit of revenge.

What the facts are in this case is merely — is a matter . . . solely for you, the jury, to determine given all the circumstances of this case.

To justify a homicide, it is not essential that . . . there must be an actual assault made upon the defendant. Threats accompanied by menaces, though the menaces do not amount to any actual assault, may in some instances be sufficient to arouse a reasonable belief that one's life is in imminent danger and that one is in imminent danger of great bodily injury or that a forcible felony is about to be committed upon one's person.

Provocation by threats or words alone will in no case justify the homicide when the killing is done solely in resentment of the provoking words.

Whether or not the killing — whether or not the killing, or if there was . . . a killing, was done under circumstances that would be justifiable or was done solely as a result of and resentment of threats or provoking words alone, is a matter for you, the jury, to determine.

If you believe the defendant was justified under the instructions that the court has given to you, then it would be your duty to acquit the defendant.

In applying the law of self-defense, a defendant is justified to kill another person in defense of self. The standard is whether the circumstances were such that

present is a matter of trial strategy and subsequent disagreement with such strategy cannot form the basis of a valid ineffective assistance claim. See *Jessie v. State*, 294 Ga. 375 (2) (a) (754 SE2d 46) (2014). This allegation of error cannot be sustained.

4. Relying on *Pullin v. State*, 257 Ga. 815 (2) (364 SE2d 848) (1988) and § 3.10.10 of the Georgia Suggested Pattern Jury Instructions (Criminal), the trial court gave the following charge to the jury:

> A person is not justified in using force if that person initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant, *is attempting to commit, is committing, or is fleeing after the commission or attempted commission of a felony*, was the aggressor or was engaged in a combat by agreement, unless the person withdraws from the encounter and effectively communicates his intent to withdraw to the

would excite not merely the fears of the defendant but the fears of a reasonable person. For the killing to be justified under the law, the accused must truly have acted under the influence of these fears and not the spirit of revenge.

A person commits simple assault when that person attempts to commit a violent injury to the person of another or commits an act that places another in reasonable apprehension of immediately receiving a violent injury.

The use of excessive or unlawful force while acting in self-defense is not justifiable and the defendant's conduct in this case would not be justified if you find that the force used exceeded that which the defendant reasonably believed was necessary to defend against the victim's use of unlawful force, if any.

A person has the right to defend himself, but a person is not justified in deliberately assaulting another person solely in revenge for a past or previous wrong, regardless of how serious the past or previous wrong might have been when the episode involving the previous wrong has ended. Such person is not justified in acting out of revenge by deliberately seeking out and assaulting the alleged wrongdoer.

If you find from the evidence in this case that the defendant used force against the alleged victim named in this indictment in order to prevent an impending wrong that the defendant reasonably believed was about to be committed by such other person and the defendant reasonably believed that such force was necessary in order to prevent such impending wrong, then that use of force would be justified and it would be your duty to acquit the defendant.

On the other hand, if you believe beyond a reasonable doubt from the evidence in this case that the defendant used force against the alleged victim named in the indictment for the sole purpose of avenging a past or previous wrong, regardless of how serious such previous wrong may have been and not for the purpose of preventing an impending wrong, then you would be authorized to convict the defendant.

During deliberations, the jury asked the trial court for definitions of all the crimes charged and the definition of self-defense, including defense of habitation. The trial court ultimately recharged the jury on all of the criminal charges and all of the charges concerning justification, self-defense, and defense of habitation as referenced above.

other person and the other person still continues or threatens to continue the use of unlawful force.

(Emphasis supplied.) Defense counsel objected to the emphasized language[18] which is taken directly from OCGA § 16-3-21 (b) (2). During the charge conference, the State argued the language was applicable because at the time appellant shot Daniels, appellant had already completed an aggravated assault against Daniels by pointing the gun at him and that appellant had been so charged in the indictment. The State also argued that the language of the entire pattern charge was applicable because there was some evidence that appellant was the aggressor by saying "I'm going to get him," or words to that effect, and telling Daniels to "come here." The trial court was initially hesitant to give the charge, surmising anyone who shoots someone would never be entitled to argue self-defense; but, after reading *Pullin*, gave the full pattern charge. Appellant characterizes the emphasized language as surplusage and opines the charge had the effect of confusing the jury in a manner that was not harmless error.

Given the specific facts of this case, where there was no intervening interlude between appellant pointing his gun and shooting the victim, we agree with appellant that the trial court erred when it included the language at issue in the charge and believe the trial court was on the right track with its initial instinct to exclude the language. We also note that the opinion in *Pullin v. State* does not state what charge was actually given by the trial court in that case, but merely opines that the charge was consistent with the law as set forth in OCGA § 16-3-21 (a) and (b) (id. at 816-817); and so *Pullin* does not add anything to the issue at hand one way or the other. With that being said, we believe any error is ultimately harmless in light of appellant's trial testimony that he shot the victim because the victim had previously said he was going to get his "tool," the undisputed evidence that the victim was unarmed when appellant shot him, and the fact that the trial court fully charged the jury on the defense of self and the defense of habitation. Accordingly, we see no basis to reverse appellant's conviction.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 3, 2016.

*Gerard B. Kleinrock*, for appellant.

---

[18] Since defense counsel objected to the charge, any assertion that trial counsel was deficient cannot be sustained.

*Robert D. James, Jr., District Attorney, Deborah D. Wellborn, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General,* for appellee.